## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 24 2015, 8:38 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Ann M. Sutton
Marion County Public Defender Agency,
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl M. Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Raymond Welch,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 24, 2015

Court of Appeals Case No.
49A04-1409-CR-432

Appeal from the Marion Superior Court

The Honorable Helen Marchal, Judge

Cause No. 49G16-1407-CM-34351

**Brown, Judge.**

[1] Raymond Welch appeals his conviction for battery as a class A misdemeanor. Welch raises one issue, which we revise and restate as whether the evidence is sufficient to sustain his conviction. We affirm.

*Facts and Procedural History*

[2] On June 30, 2014, Nicole Heady and Welch were dating and had been staying at the home of Welch's brother for two days. Heady phoned her mother asking if she could meet her with some clean clothes at a market a few blocks from the home, and her mother agreed. Welch and Heady had been fighting earlier that afternoon, and when Heady left the home on foot Welch followed and yelled things "like 'oh you don't never listen' and 'all you are worried about is your phone' and 'you are worthless. You are a b----. You are a c--- . . . .'" Transcript at 7. Welch was "angry, very angry." *Id.* Heady at first did not respond, instead listening to music playing on her phone and walking while Welch followed from behind, and Welch then "come up from behind out of nowhere" and "snatched [her] phone . . . ." *Id.* at 8. Heady asked him repeatedly not to "smash [her] phone," and after "begging and pleading about five or six times to give it back he actually gave it back." *Id.* at 8-9. At that time, Welch told Heady: "all you are worried about is Facebook. All your [sic] worried about is this phone. I am not nothing. You are a b----." *Id.* at 9. Heady observed that Welch was "even more angrier," noting that his jawbone was clenched, he was gritting his teeth together, and he had his fists clenched. *Id.*

[3] After Heady received her phone back from Welch, she "stuck it in between [her] breasts so that that way maybe he couldn't get it again," and she kept

walking to meet her mother. *Id.* at 10. At this time, Heady's phone inadvertently called her "aunt and uncle's house" and the call "went to voice mail." *Id.* at 17. As she walked, Welch continued to yell profanities, and she responded in a "normal way" by stating: "'[O]kay yeah I'm stupid. Yea I am a b----.' Just pretty much agreeing with him." *Id.* at 10. While she continued to walk towards the market she heard "footsteps come up from out of nowhere behind [her] and that is when he hit the side of [her] face out of nowhere," which felt like a "hammer hitting [her] head" and caused physical pain in the form of "a throbbing sensation." *Id.* at 11-12. Heady continued to walk and "was crossing the street to try and get away from him, back and forth, back and forth," Welch followed and continued to yell, and he came from behind and "grabbed [her] hair and pushed [her] straight out in front of a four door silver car," which caused pain. *Id.* at 13. The car stopped and asked Heady if she needed help, Heady replied that she did need help, she entered the car, and the driver drove her to the market where she met her mother.

[4] Heady's mother arrived at the market and noticed that "the left side of [Heady's] face was all red" and that Heady was scared and was crying. *Id.* at 39. The two women went to Heady's aunt and uncle's home and called the police. While there, Heady discovered that her phone had called her aunt and uncle's number and that audio of the altercation between her and Welch had been recorded on the number's voicemail system.

[5] On July 10, 2014, the State charged Wells with Count I, battery as a class A misdemeanor; and Count II, criminal recklessness as a class B misdemeanor.

On August 26, 2014, the court held a bench trial at which evidence consistent with the foregoing was presented. The audio recording, as well as two pictures of Heady's face taken the day of the altercation, were admitted into evidence. At the conclusion of the State's case-in-chief, Welch moved for involuntary dismissal under Ind. Trial Rule 41(b) of Count II, the State did not oppose the motion, and the court granted the motion. The court found Welch guilty on Count I and sentenced him to 365 days suspended to probation and ordered that he receive twenty-six weeks of domestic violence counseling.

## *Discussion*

The issue is whether the evidence is sufficient to sustain Welch's conviction for battery as a class A misdemeanor. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting evidence most favorably to the trial court's ruling. *Id.* We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* at 147. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

The offense of battery is governed by Ind. Code § 35-42-2-1 which at the time of the offense provided in relevant part: "(a) A person who knowingly or

intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor. However, the offense is: (1) a Class A misdemeanor if: (A) it results in bodily injury to any other person . . . ." (Supp. 2012) (subsequently amended by Pub. L. No. 158-2013, § 420 (eff. July 1, 2014); Pub L. No. 147-2014, § 2 (eff. July 1, 2014)). The charging information alleged that "[o]n or about June 30, 2014, Raymond Welch did knowingly touch Nicole Heady, another person, in a rude, insolent, or angry manner, resulting in bodily injury, specifically pain . . . ." Appellant's Appendix at 16 (capital letters omitted). Thus, to convict Welch of battery as a class A misdemeanor, the State needed to prove that Welch touched Heady in a rude, insolent, or angry manner, causing her pain.

[8] Welch argues that "[l]istening to the tape is very telling," noting that "[o]n the recording, she tells him he hit her. If he hit her intentionally, it would seem he would already know that fact." Appellant's Brief at 4-5. Welch asserts that Heady "also says, 'all the redness,'" and that "[w]ithout a mirror or someone to point it out, it is hard to imagine why [she] would say there was redness." *Id.* at 5. Welch states that Heady "testified that though she and [Welch] were engaged in a verbal disagreement, he 'came out of nowhere' and hit her in the head," and also suggests that "there exists at least an inference that the recording may not have been as accidental as asserted by" Heady. *Id.* at 4-5. Welch also contends that the pictures admitted into evidence do not "show any definitive redness as this Court may well view," and that although Heady

testified that he "pushed her in front of a car," a review of the tape reveals that he told "her to get out of the street." *Id.* at 5-6.

[9] The State asserts that Welch "suggests to this Court that the recording was not accidental and presumably . . . urges this Court to conclude that [Heady] was attempting to frame" Welch, and it argues that "[t]his would be a clear example of the Court viewing the evidence in a manner least favorable to the verdict, which would be directly contrary to the standard of review." Appellee's Brief at 5. The State notes the following regarding what is revealed on the audio recording:

> When the Court listens to State's Exhibit 3, it will hear at the 1:34 mark, [Heady] tell [Welch], "that's where you're wrong." Immediately following that statement, there is a loud rustling sound, followed by [Heady] screaming, "Oh my god!" [Welch] can then be heard saying, "f------ (indecipherable) bitch." From 2:35 until 2:39, [Welch's] voice can be heard faintly in the background saying something to [Heady]. [Heady] responds at 2:40, "But yet you just hit me in the head. You just punched me in the head." [Welch] says something that is presumably a protestation of innocence, which prompts [Heady] to respond, "Yes, you did." [Welch] then says something and [she] responds, "All the redness?" At the 3:06 mark, [Welch] can be heard saying something to [Heady] which causes [her] to say, "No, I don't want you fucking around me. I'm scared to death." [Welch] can be heard shouting at her angrily, then [she] is heard screaming, "Stop! Don't! Stop!" and then she is screaming. [Welch] can be heard shouting "(Indecipherable) dumb ass b----! Get the f--- out of the street!" The next voice heard is [Heady] explaining – presumably to the motorist who stopped to help her – "No, he's trying to hit me and I'm trying to [find?] my mom."

*Id.* at 5-6 (internal citations omitted).

The facts favorable to the conviction reveal that Heady left the home of Welch's brother's home to meet her mother and obtain clean clothes at a market a few blocks away, and Welch, who was very angry, followed her and yelled profanities at her. Welch approached Heady from behind and took her phone, eventually giving the phone back. Heady stuck the phone between her breasts, as she did she inadvertently called her aunt and uncle's house, and the call went to voice mail and made an audio recording of the ensuing events.

Heady continued walking towards the market while Welch continued to yell profanities. She then heard footsteps behind her and Welch hit the side of her face which caused physical, throbbing pain. Soon after, Welch grabbed Heady by her hair and pushed her in front of a car, which again caused pain. The driver of the car transported her to the market, and when Heady met her mother, her mother observed that "the left side of [Heady's] face was all red" and that Heady was scared and was crying. *Id.* at 39.

To the extent Welch suggests that the audio recording supports a not guilty verdict, we observe that the recording appears to begin with an argument between Heady and Welch in which Heady tells Welch twice "I'm cool" and, on four occasions, Heady states: "That's where you're wrong," and Welch responds by asking: "What?" State's Exhibit 3 at 1:20-1:34. After the fourth time, there is a commotion in which Heady screams and shouts something and Welch can be heard stating "f------ (inaudible) b----." *Id.* at 1:34-1:37. Thereafter, no one speaks for about thirty seconds and it sounds as though Heady is walking. *Id.* at 1:38-2:03. Words between the two are exchanged

which are mostly inaudible, and at one point Heady states: "Well yea you just hit me in the head. You just punched me in my head. Yes you did. All the redness." *Id.* at 2:39-2:48. It sounds as though Welch is also speaking during this time, but his speech is inaudible. Welch soon after says something, and Heady responds: "No I don't want you f------ around me. I'm scared to death of you." *Id.* at 3:07-3:11. After, Heady again starts screaming and protesting with repeated shouts of "Stop!" and Welch can be heard shouting and stating: "What the f---. How (inaudible) you feel this b----," followed by "Get the f--- out of the street." *Id.* at 3:12-3:19. Soon after, Heady can be heard explaining to someone "No, he's trying to hit me and I'm trying to (inaudible) my mom." *Id.* at 3:32-3:34. We cannot say that our review of the recording leads to a conclusion that "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Drane*, 867 N.E.2d at 146.

[13] Based on the record, we conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have found that Welch was guilty of battery as a class A misdemeanor.

## *Conclusion*

[14] For the foregoing reasons, we affirm Welch's conviction for battery as a class A misdemeanor.

[15] Affirmed.

Crone, J., and Pyle, J., concur.